*361 JUDGMENT
MARK BUTTERFIELD *, Chief Judge.
INTRODUCTION
This is an enrollment controversy with Constitutional overtones. The plaintiffs, descendants of Frank Whitewater and Maggie Dickson Whitewater, have alleged that an equal protection violation occurred in their enrollment process, and that the Tribal Enrollment and MEMBERSHIP Act of 1995 unconstitutionally required that they each re-submit the membership application that had been filed after the adoption of the new Constitution of the Ho-Chunk Nation on November 4, 1994. The issues have been briefed and Oral Argument occurred on March 29, 2000. This matter is now ripe for a decision.
PROCEDURAL HISTORY
This case began with the filing of a Complaint by Attorney Mark Goodman on August 10, 1999. The defendants, by and through Attorney Sheila Corbine, filed a timely Answer on August 25, 1999. On February 11, 2000, the defendants filed a Motion to Dismiss. On February 28, 2000, the plaintiffs filed a Motion in Opposition to Defendants' Motion to Dismiss. On March 1, 2000, the plaintiffs filed a Motion for Declaratory Judgment. On March 16, 2000, the parties filed a Stipulation of Facts. The plaintiffs filed their Brief on March 24, 2000. The defendants also filed their Brief on March 24, 2000. Oral Argument was held on March 29, 2000. The defendants filed the additional documents requested by the Court at Oral Argument on April 13, 2000.
APPLICABLE LAW
Constitution Of The Ho-Chunk Nation
Article II — Membership
Section 1. Requirements. The following persons shall be eligible for membership in the Ho-Chunk Nation, provided, that such persons are not enrolled members of any other Indian nation:
(a) All persons of Ho-Chunk blood whose names appear or are entitled to appear on the official census roll prepared pursuant to the Act of January 18, 1881 (21 Stat. 315), or the Wisconsin Winnebago Annuity Payroll for the year one thousand nine hundred and one (1901); or the Act of January 20, 1910 (36 Stat. 873), or the Act of July 1, 1912 (37 Stat. 187); or
(b) All descendants of persons listed in Section 1(a), provided, that such persons are at least one-fourth (1/4) Ho-Chunk blood.
Section 5. Membership Code. The Legislature shall have the power to enact laws not inconsistent with this Article to govern membership. Removal of any person who is not eligible for membership from the Membership Roll shall be done in accordance with the Membership Code, provided, that such removal is approved by at least a two-thirds (2/3) vote of the General Council.
*362 Article IV — General Council
Section 1. Power.s of th e General Council. The People of the Ho-Chunk Nation hereby grant all inherent sovereign powers to the General Council. All eligible voters of the Ho-Chunk Nation are entitled to participate in General Council.
Section 2. Delegation of Authority. The General Council hereby authorizes the legislative branch to make laws and appropriate funds in accordance with Article V. The General Council hereby authorizes the executive branch to enforce the laws and administer funds in accordance with Article VI. The General Council hereby authorizes the judicial branch to interpret and apply the laws and Constitution of the Nation in accordance with Article VII.
Article V — Legislature
Section 2. Powers of the Legislature. The Legislature shall have the power:
(a) To make laws, including codes, ordinances, resolutions, and statutes;
jjs ⅜ ⅜ ⅜
(r) To protect and foster Ho-Chunk religious freedom, culture, language, and traditions;
(s) To promote public health, education, charity, and such other services as may contribute to the social advancement of the members of the Ho-Chunk Nation;
⅜ * ⅜ ⅜
(x) To enact any other laws, ordinances, resolutions, and statutes necessary to exercise its legislative powers delegated by the General Council pursuant to Article III including but not limited to the foregoing list of powers.
Section 3. Codes. The Legislature shall adopt Codes governing Membership, Open Meetings, Elections, Ethics including conflicts of interest, nepotism, and the conduct of all elected and appointed officials and employees, and other Codes as deemed necessary.
Article VII — Judiciary
Section 4. Powers of the Judiciary. The judicial power of the Ho-Chunk Nation shall be vested in the Judiciary. The Judiciary shall have the power to interpret and apply the Constitution and laws of the Ho-Chunk Nation.
Section 5. Jurisdiction of the Judiciary.
(a) The Trial Court shall have original jurisdiction over all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs and traditions of the Ho-Chunk Nation, including eases in which the Ho-Chunk Nation, or its officials and employees, shall be a party. Any such case or controversy arising within the jurisdiction of the Ho-Chunk Nation shall be filed in the Trial Court before it is filed in any other court. This grant of jurisdiction by the General Council shall not be construed to be a waiver of the Nation’s sovereign immunity.
Section 6. Powers of the Tribal Court.
(a) The Trial Court shall have the power to make findings of fact and conclusions of law. The Trial Court shall have the power to issue all remedies in law and in equity including injunc-tive and declaratory relief and all writs including attachment and mandamus.
(b) The Ti’ial Court shall have the power to declare the laws of the Ho-Chunk Nation void if such laws are not in agreement with this Constitution.
*363 Article X — Bill of Rights
Section 1. Bill of Rights.
(a) The Ho-Chunk Nation, in exercising its powers of self-government, shall not:
(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;
(9) pass any bill of attainder or ex post facto law
Article XII — Sovereign Immunity
Section 1. Immunity of Nation from Suit. The Ho-Chunk Nation shall be immune from suit except to the extent that the Legislature expressly waives its sovereign immunity, and officials or employees of the Ho-Chunk Nation acting within the scope of their duties or authority shall be immune from suit.
Section 2. Suit Against Officials and Employees. Officials or employees of the Ho-Chunk Nation who act beyond the scope of their duties or authority shall be subject to suit in equity only for declaratory and non-monetary injunctive relief in Tribal Court by persons subject to its jurisdiction for purposes of enforcing rights and duties established by this constitution or applicable laws.
Article XIV — Savings Clause
All actions of the Nation, formerly known as the Wisconsin Winnebago Tribe, taken before the effective date of the Constitution, including elections and terms of office, shall remain in full force and effect to the extent that they are consistent with this Constitution.
Winnebago Tribe of Wisconsin Enrollment Ordinance
Chapter 4. PROCEDURES FOR ENROLLMENT
Section 404. Review of applications.
The Enrollment Sub-Committee shall review all enrollment applications according to the membership criteria in Article II, Sec. 1 of the Constitution, and Section 301(a) and (b) of this Ordinance. It shall consider the information provided in such applications and all other available evidence concerning the applicant’s eligibility for membership.
Section 405. Recommendation and initial decision.
(a) If the Enrollment Sub-Committee recommends that an application be granted, and the Business Committee approves that recommendation, the applicant shall be enrolled in the Tribe, his or her name shall be listed for entry on the Tribal roll maintained as provided in Title 7 of this Ordinance, and the applicant shall be notified by certified mail, postage fully prepaid, return receipt requested.
(b) If the Enrollment Sub-Committee recommends that the application be rejected, or if the Business Committee determines initially to reject a recommendation of the Enrollment Sub-Committee that an application be granted, the Sub-Committee or the Business Committee as the case may be shall notify the applicant in writing of its recommendation or decision, and the reasons therefore. The notice shall be sent by certified mail, postage fully prepaid, and return receipt requested, and shall state a time and place where the Business Committee shall hold a hearing at which the applicant may appear before the Business Committee to present any evidence he or she wishes relevant to the application. Such hearing shall be scheduled not less than twenty (20) days from the date the notice is sent to the applicant.
*364 Section 400. Hmfvng.
The applicant has the burden of proof to establish at the hearing to the satisfaction of the Business Committee that the applicant meets all of the requirements for tribal membership. The applicant shall have the right to participate in the hearing, to be represented by counsel at his or her own expense, to present oral and written testimony of witnesses under oath and to cross-examine any other witness at the hearing. Formal rules of evidence shall not apply at the hearing, but evidence which is irrelevant, cumulative or which would be unfair or unduly prejudiced shall be excluded or may be admitted by the Business Committee only under special conditions or stipulations.
Section 407. Final decision.
After the hearing, the Business Committee shall make its final decision in a written resolution signed by the Chairman of the Business Committee. The determination shall show: (1) whether the Enrollment Sub-Committee recommended that the application be approved or rejected; (2) the date of the applicant’s birth; and (3) the final determination of the Business Committee, including the membership requirement or requirements which the Business Committee found that any rejected applicant failed to establish. The applicant shall be mailed a copy of the decision by certified mail, postage fully prepaid, return receipt requested. This decision shall be final for the Tribe and shall be subject to appeal to the Secretary of the Interior as provided in the Secretary’s regulations,
TkIUAI. ENROLLMENT ANI) Ml-.MISERStm' ACT ok 1995 (enacted Nov. 28, 1.995 by HCNLB. No. 015-95)
Section 6. Application for Enrollment
(a)The burden of applying for enrollment and meeting the established requirements for Membership shall be upon the person seeking to be enrolled, or such person’s sponsor.
(b) If a person is a minor, deceased, incompetent, or otherwise lacks the capacity to file an application, an application may be sponsored on that person’s behalf, by a parent or legal guardian, next of kin, spouse.
(c) If a person is deceased, an application may be sponsored on that person’s behalf by the executor or administrator of a deceased person’s estate for the purpose of memorializing membership only, without conferring any privileges, rights or immunities hereinto.
(d) Before final approval of an application for enrollment, the Tribal Enrollment Office shall publish the applicant’s name in the Nation’s newspaper and in the Tribal Executive Office and all District Offices.
(e) All rights, benefits, privileges, and immunities of Membership shall take effect immediately upon timely approval of an application by the Office of Tribal Enrollment, PROVIDED, That such approval shall not be retroactive.
(f) Applications submitted but not approved prior to the enactment of this Act must be re-submitted by the applicant. The Tribal Enrollment Office shall within fourteen (14) days after the date of enactment of this Act, to compile a list of the applicants of such pending applications and give notice to each applicant of the requirement to re-submit.
(g) Any person who knowingly submits false information on an application for enrollment may be subject to a *365 fine of not more than five hundred dollars ($500.00) per offense and any equitable relief which the Trial Court may deem appropriate, including court costs.
Section 8. Computation of Percentage of Ho-Chunk Blood
(a) For purposes of determining percentage of Ho-Chunk Blood to meet the one-quarter (1/4) requirement in Article II, Section 1(b) of the Constitution and Section 7 of this Act, the percentage provided on the Base Rolls shall be computed with no segregation of Wisconsin and Nebraska ancestry.
(b) If the Base Rolls provide no blood percentage, the Office of Enrollment shall determine that the percentage of Indian blood is 4/4 (100%), unless the Office, with the advice of the Committee, determines by substantial evidence that the actual percentage is lower.
Section 9. Privileges and Immunities
(a) No person shall be denied the privileges and immunities accorded all Members.
Section 12. Appeals
(a) Any member, applicant or sponsor shall have the opportunity to appeal any action of the Office to the Committee on Tribal Enrollment. Such appeal shall be filed within sixty (60) days after the date on which the Tribal Enrollment Office publishes and posts notice of its final determination. The Committee shall within ten (10) days review and revise any finding of fact or conclusion of law within the scope of the appeal. The Committee’s determination shall be deemed final for the purposes of judicial review.
(b) Any person or sponsor shall have the opportunity to appeal any final determination of the Committee to the Tribal Court. Such appeal shall be filed within one hundred and eighty (180) days after the date the Committee issues its final determination. If such an appeal is made by a sponsor, the court’s determination shall not preclude the applicant upon becoming available or attaining capacity from filing a subsequent appeal.
Section 17. Severability
(a) If any provisions of this Act are determined by the Judicial Branch of the Ho-Chunk Nation to be contrary to the Constitution, the invalid provision shall be severed and the remaining provisions shall remain in full force and effect.
Ho-Chunk Nation Per Capita Distribution Ordinance[1]
Fiscal Year 1995-1996
V. MEMBERSHIP AND ELIGIBILITY FOR PER CAPITA DISTRIBUTION
Section 5.01 Applications, Written Determination of Eligibility.
(a) All members of the Ho-Chunk Nation that are on the tribal rolls shall be eligible to receive per capita distributions. Such distribution shall be made in equal amount of money to each tribal member eligible to re *366 ceive a per capita distribution pursuant to this ordinance.
(b) Persons seeking membership in the Ho-Chunk Nation may fill out an application for a finding of eligibility in accordance with the Tribal Enrollment Ordinance. Applications for a finding of eligibility may be made at any time, and shall be submitted in such form and manner as the Enrollment Officer may reasonably require.
(c) In order to provide for the orderly review and consideration, applications submitted within 60 (SIXTY) days or less of a scheduled distribution date shall not be found eligible for distribution until the next scheduled distribution. At least 45 (FORTY-FIVE) days but no longer than 50 (FIFTY) days before the quarterly date of the distribution of per capita payments as provided in Section 6 of this Ordinance, the Enrollment Officer shall publish a list of those persons found eligible for such payments. Any applicant found not to be eligible shall be provided with a written determination of the basis for the denial.
Ho-Chunk Nation amended Per Capita Distribution Ordinance[2]
Fiscal Year 1995 — 1996 (As Amended by Resolution No. 01/30/96B)
V. MEMBERSHIP AND ELIGIBILITY FOR PER CAPITA DISTRIBUTION
Section 5.01 Application, Written Determination. of Eligibility
(a) All members of the Ho-Chunk Nation that are on the tribal rolls shall be eligibile to receive per capita distributions. Such distributions shall be made in an equal amount of money to each tribal member eligible to receive a per capita distribution pursuant to this ordinance.
(b) Persons seeking membership in the Ho-Chunk Nation may fill out an application for a finding of eligibility in accordance with the Tribal Enrollment Ordinance. Applications for a finding of eligibility may be made at any time, and shall be submitted in such form and manner as the Enrollment Officer may reasonably require.
(c) In order to provide for the orderly review and consideration, applications submitted approved within 60 (SIXTY) days or less of a scheduled distribution date shall not be found eligible for distribution until the next scheduled distribution. At least 45 (FORTY-FIVE) days but no longer than 50 (FIFTY) days before the quarterly date of the distribution of per capita payments as provided in Section 6 of this Ordinance, the Enrollment Officer shall publish a list of those persons found eligible for such payments. Any applicant found not to be eligible shall be provided with a written determination of the basis for the denial.

Ho-Chunk Nation Rules of Civil Procedure

Rule 53. Relief Available.
*367 Except in a Default Judgement, the Court is not limited to the relief requested in the pleading and may give any relief the evidence makes appropriate. The Court may only order such relief to the extent allowed by Ho-Chunk Nation enactments. The Court may order any party to pay costs, including filing fees, costs of service and discovery, jury and witness costs. Findings of fact and conclusions of law shall be made by the Court in support of all final judgements.
Rule 58. Amendment to or Relief from Judgement or Order.
(A) Relief from Judgement. A Motion to Amend, or for relief from judgement, including a request for a new trial shall be made within ten (10) calendar days of the filing of judgement. The Motion must be based on an error or irregularity which prevented a party from receiving a fair trial or a substantial legal error which affected the outcome of the action.
(B) Motion for Reconsideration. Upon motion of the Court or by motion of a party made not later then ten (10) calendar days after entry of judgement, the Court may amend its findings or conclusions or make additional findings or conclusions, amending the judgement accordingly. The motion may be made with a motion for a new trial. If the Court amends the judgement, the time for initiating an appeal commences upon entry of the amended judgement. If the Court denies a motion filed under this rule, the time for initiating an appeal from the judgement commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) days after the entry of judgement, the Court does not decide a motion under this Rule or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating an appeal from judgement commences in accordance with the Rules of Appellate Procedure.
(C) Erratum Order or Reissuance of Judgement. Clerical errors in a court record, including the Judgement or Order, may be corrected by the Court at any time.
(D) Grounds for Relief. The Court may grant relief from judgements or orders on motion of a party made within a reasonable time for the following reasons: (1) newly discovered evidence which could not reasonably have been discovered in time to request a new trial; or (2) fraud, misrepresentation or serious misconduct of another party to the action; or (3) good cause if the requesting party was not personally served in accordance with Rule 5(e)(1)(a) or (b); did not have proper service and did not appear in the action; or (4) the judgement has been satisfied, released, discharged or is without effect due to a judgement earlier in time.
Rule 61. Appeals.
Any final Judgement or Order of the Trial Court may be appealed to the Ho-Chunk Nation Supreme Court. The Appeal must comply with the Ho-Chunk Nation Rules of Appellate Procedure, specifically Rules of Appellate Procedure, Rule 7, Right of Appeal. All subsequent actions of a final Judgement, or Trial Court Order must follow the HCN Rules of Appellate Procedure.
*368 FINDINGS OF FACT
1. On January 19, 1976, the Bureau of Indian Affairs [hereinafter BIA] mailed notices of distribution of judgment funds to all Wisconsin Winnebago and Nebraska Winnebago tribal members. The letter stated that the deadline for all applications was established by both tribes as March 15,1976. However, applicants had to meet requirements for enrollment as specified in the tribal constitution of the tribe they were applying to for membership. It was necessary for applicants to relinquish membership in one of the tribes in order to qualify for funds.
2. Chapter 3, Membership, of the Wisconsin Winnebago Business Committee Enrollment Ordinance [hereinafter WWBC Enrollment Ordinance] clearly stated that all enrolled members must have a minimum of one quarter (1/4) Wisconsin Winnebago blood quantum.
3. Chapter 4, Procedures for Enrollment, included assignment of identification numbers, review of applications, and Section 407, Final Decision, stated that the Business Committee’s decision was final for the Tribe. The applicant could appeal to the Secretary of the Interior.
4. All of the plaintiffs are adults and are enrolled members of the Ho-Chunk Nation since June 20,1996.
5. All plaintiffs are descendants of Frank Whitewater and Maggie Dickson Whitewater. Frank was listed on the 1940 Census Roll of the Wisconsin Winnebago Indian Tribe. Maggie was shown on the 1901 Annuity Roll. Frank and Maggie had two sons, Jesse Whitewater and Frank Whitewater, Jr. Jesse Whitewater had two sons, James and Raymond. James Whitewater is the father of the plaintiffs Kenneth Whitewater, Dean Whitewater, Barbara Whitewater Engen, Kathleen Whitewater, and Joan Marie Whitewater. The late Raymond Whitewater was the father of plaintiffs Vicki Johnson, Larry Whitewater, Gerald Whitewater, and Tina Whitewater Danielski.[3]
6. Frank Whitewater, great-grandfather of the plaintiffs, was ½ Wisconsin Winnebago[4] and ½ Nebraska Winnebago. Maggie Dickson, great-grandmother of the plaintiffs, was a full-blood Wisconsin Winnebago. Jesse Whitewater, grandfather of the plaintiffs, was ¾ Wisconsin Winnebago and'/i Nebraska Winnebago. James Whitewater and the late Raymond Whitewater, the fathers of the plaintiffs as enumerated in Finding of Fact # 5, possessed) 3/8 Wisconsin Winnebago blood quantum, and 1/8 Nebraska Winnebago blood quantum.
7. James Whitewater first sought to enroll the plaintiffs as members of the Wisconsin Winnebago tribe in the 1960s.
8. In 1976 the plaintiffs applied to the Wisconsin Winnebago Business Committee Enrollment Department for acceptance into the Wisconsin Winnebago tribe. On March 8, 1976 the applications for membership for the children of James Whitewater and the late Raymond Whitewater were accepted by the Wisconsin Winnebago Committee. See Ex. A-l.
9. Shortly thereafter, the plaintiffs were issued the following ID Nos.: Joan Marie Whitewater (439A002636); Dean Allen Whitewater (439A002626); Kathleen Lynn Whitewater (439A002638); Kenneth Lee Whitewater (439A002639); Barbara Ann Engen (439A002622); Tina Marie *369 Danielski (439A002646); Gerald Ray Whitewater (439A002660); and Larry Edward Whitewater (439A0G2685).
10. On August 9, 1977 the BIA, due to the degree of Wisconsin Winnebago blood quantum being less than the required one-quarter (1/4), rejected the applications of the plaintiffs. The applicants (plaintiffs) were determined to have only one eighth (1/8) degree of Wisconsin Winnebago blood quantum. See Ex. B-2.[5]
11. The Whitewaters appealed this decision in August 1977. On September 7, 1977 the BIA’s recommendation was that the decision for rejection of the plaintiffs’ applications be sustained.
12. On February 12, 1978, a special meeting for enrollment was conducted by a committee of the Wisconsin Winnebago Business Committee [hereinafter WWBC]. Specifically on February 12, 1978, a motion was made by Josie White Eagle, second by Jesse Littlegeorge, to include names of descendants of Frank Whitewater (1940 Census Roll) or Maggie Dickson Whitewater (shown on the 1901 Annuity Roll, age 23) including their son Jesse Whitewater and Frank Whitewater Jr.’s children and grandchildren, who are ⅛ Wisconsin Winnebago blood or more, be included on the Wisconsin Winnebago tribe enrollment for claims distribution, as attested to by Edward Cloud and information received from Rose Miner on February 11 and 12, 1978. See Ex. D-4.
13. The Whitewaters continued to seek enrollment within the Wisconsin Winnebago Tribe, and on February 25, 1978, their applications were accepted, along with any documentation that they had attached. The Committee voted seven (7) in favor and two (2) abstaining to accept thirty-eight (38) names listed with documentation. See Ex. E-5.
14. The BIA sent a memorandum dated March 2, 1978, acknowledging that the plaintiffs had been added to the tribal rolls. See Ex. F-6. This BIA memo also indicated that it had not yet received copies of the minutes and resolutions from the February 25, 1978 meeting, nor copies of the minutes and resolutions from the February 11, 1978 meeting held at the Blue Wing Housing project. It concluded that it was “holding the original resolution and tribal roll until the action taken on February 25,1978, is received.” See id.
15. The Ho-Chunk Nation Education Department has no records of post-high school education for plaintiff Vicki Lee Johnson. There are no records indicating that the plaintiffs received tribal benefits on a sporadic basis.
16. The Wisconsin Winnebago Tribe did not notify the plaintiffs that they were no longer on the tribal membership rolls, as notice had been sent from the United States Department of Interior, BIA.
17. At a Special WWBC meeting on February 11, 1984, it was determined that the records of the Whitewater children’s grandfather could not be provided to prove he had been on the 1881 or the 1901 Rolls. See Ex. G-7.
18. Mr. Whitewater continued trying to enroll his children in the Wisconsin Winnebago tribe, and the WWBC continued to reject the applications due to the one-fourth (1/4) blood quantum requirement. See Ex. H-8.
19. An Area I meeting of the WWBC was conducted on August 5, 1985. James *370 Whitewater requested tribal membership for his children, including the plaintiffs. A motion was made to add the plaintiffs’ names to the tribal rolls contingent upon verification of Winnebago blood quantum. The motion unanimously carried. See Ex. 1-9.
20. A special meeting of the WWBC was conducted on August 17, 1985. The plaintiffs’ enrollment was discussed again. “James Whitewater told the committee that he wanted to get his children back on the rolls and that the tribal secretary did not get information out to the committee. Some committee members said they had received the information. He said if his children are not put back on the rolls he is considering suing someone.” See Ex. J-10.
21. On October 10, 1987 James Whitewater again requested enrollment of his children, including the plaintiffs, at the WWBC quarterly meeting. A motion was approved referring “Mr. Whitewater’s case to the tribal attorney for research.” See Ex. K-ll.
22. A special meeting of the WWBC was conducted on November 14, 1987, at Wittenberg, Wisconsin. The minutes indicate the WWBC clarified its October 10, 1987, motion concerning the enrollment of the children of James Whitewater.
Clarification on Motion 2. Motion states James Whitewater would be placed on tribal roll based on Article II, Section 1. If no new documentation has been supplied to enrollment to BIA, there will be no change. The rejection will remain. Motion to remain the same.
See Ex. L-12.
23. An enrollment subcommittee meeting of the WWBC was conducted on March 26, 1988 at the Ho-Chunk Bingo Office. The minutes indicate the following;
An entire family has been denied enrollment by Enrollment Subcommittee but the BIA put back on. The committee felt there was not enough proof to enroll. The BIA reversed the Tribe on the basis of two handwritten letters.
See Ex. M-13.
24. An enrollment subcommittee meeting of the WWBC was conducted on July 1, 1988, at the Holiday Inn in Wisconsin Dells. The minutes indicate the following:
Adam [Hall] continued with his verbal report, and, added the Whitewater enrollment question and recommended that this be forwarded to the Business Committee after we draft said letter from information available.
James Whitewater. MOTION by Larry, seconded by Sharon that we recommend to the WWBC that they write a letter to Mr. Whitewater with the understanding of what the Tribal attorney had recommended, to send the attorney’s letter stating that 4/16 blood quantum requirement is necessary to meet eligibility for enrollment. MOTION CARRIED UNANIMOUSLY.
See Ex. N-14.
25. A quarterly meeting of the WWBC was conducted on Aril 21, 1990. The minutes indicate the following:
MOTION: Pari', that we refer this Jim Whitewater issue to the Enrollment Subcommittee. Second by Dolli. Motion carried unanimously.
See Ex. 0-15.
26. The Tribal Enrollment Subcommittee of the WWBC met on January 6, 1994. The minutes indicate that it accepted sixty (60) applicants for enrollment with the exception of # 11. See Ex. P-16.
27. A WWBC quarterly meeting was conducted on January 8, 1994, and a mo *371 tion was made and carried to approve; the fifty-nine (59) names as enrolled members, with the exception of # 11, by Resolution # 1/8/94-E.
28. On November 1, 1994 the new Constitution of the Ho-Chunk Nation became effective. According to the new membership requirements, the Whitewater children were eligible for membership and enrollment in the Ho-Chunk Nation.
29. On November 23, 1994, the plaintiffs submitted applications to the Ho-Chunk Nation Office of Tribal Enrollment [hereinafter Enrollment] for membership.
BO. On January 11, 1995 the Enrollment Office notified the descendents of Frank Whitewater and Maggie Dickson Whitewater that all applications filed with their office would be in “pending” enrollment status until the new Membership Code came into effect. See Ex. R-18.
31. On March 31, 1995 the Ho-Chunk Nation Enrollment Committee met and approved fifty-eight (58) applications for membership, not including the plaintiffs’ November 1994 applications.
32. Ho-Chunk Code 95-013, the Tribal Enrollment and Membership Act of 1995 [hereinafter Membership Act], was adopted by the Ho-Chunk Nation Legislature [hereinafter Legislature] on November 28,1995.
33. The Membership Act required that pending enrollment applications which had not yet been approved by the date of the Membership Act’s adoption be re-submitted.
34. The Membership Act further required Enrollment to notify such applicants of the requirement to re-submit their applications within fourteen (14) davs of November 28, 1995.
35. Enrollment did not notify the plaintiffs of this requirement until December 18, 1995. See Ex. S-19.
36. The plaintiffs then re-submitted their applications.
37. On June 7, 1996 Enrollment notified the plaintiffs that their applications for enrollment with the Ho-Chunk Nation had been approved and finalized, and they were issued the same tribal enrollment numbers as had been issued to them in 1976.
38. Normal processing time for enrollment is six (6) to eighteen (18) months depending on the investigation process required.
39. The plaintiffs received notice on June 20, 1996 that they became eligible for per capita distributions effective with the May 1996 per capita payment.
40. The defendants continually tried to assist the plaintiffs with their enrollment into the Ho-Chunk Nation. See Ex. T-20.
41. Fifty-eight (58) applications were approved for membership after March 31, 1995, prior to the plaintiffs’ approval for membership in June 1996. These were completed first as they were all eligible for enrollment under the old Constitution. The defendants gave no explanation as to why it told the Whitewater descendants that their applications would be in a “pending” status until a new membership code came into effect, yet approved fifty-eight (58) applications barely two (2) months later.
42. Applications are not processed in lump groups, but on an individual basis, just as each of the plaintiffs were processed.
43. There are no timelines included in the Memiieiíshii1 Act, which specify how long processing of applications should take.
*372 44. The plaintiffs were not accepted as members under the new Constitution until June 7, 1996. According to the Ho-Chunk Nation Per Capita .Distribution Ordinance they were first eligible to receive the May 1996 per capita payment. No applicants are placed on the tribal membership rolls until they have been approved as members.
45. Per capita payments are not made to applicants. Only members who are entitled to be on the tribal rolls may receive per capita payments.
46. The enrollment process must be complete in order to qualify for per capita payments. Applications are simply not enough to be eligible for the per capita payments.[6]
47. On January 30, 1996, the Ho-Chunk Nation Legislature passed Resolution No. 01/30/96B which altered the eligibility requirements to receive per capita distributions. Prior to this date, those persons with application submitted more than sixty (60) days prior to a scheduled per capita distribution were eligible to receive that per capita distribution after their applications were approved. After this date, persons must be approved as members at least sixty (60) days prior to a per capita distribution in order to receive that per capita distribution.[7]
DECISION
This case presents a difficult enrollment issue that stems from the adoption of the CONSTITUTION OF THE HO-CHUNK NATION [hereinafter Constitution] on November 1, 1994, which incorporated both Wisconsin Winnebago blood and Nebraska Winnebago blood within the eligibility requirements for membership within the Ho-Chunk Nation. With the adoption of the Constitution, the plaintiffs and others similarly situated became eligible for enrollment. The plaintiffs allege that the Tribal Enrollment and Membership Act of 1995 [hereinafter Membership Act] unconstitutionally required them to re-submit their membership applications. The plaintiffs allege that an equal protection violation took place during their enrollment process. The plaintiffs also allege that the Ho-Chunk Nation Office of Tribal Enrollment failed to timely act on their applications, resulting in the loss of per capita distributions. The defendants allege that the plaintiffs failed to exhaust their administrative remedies contained within the Membership Act, and that there is no applicable wTaiver of sovereign immunity in this case. The Court shall address each of these allegations in turn, beginning with the allegation that the plaintiffs have failed to exhaust their administrative remedies, barring the Court from consideration of the present case.
I. DOES THE PLAINTIFFS’ FAILURE TO EXHAUST THEIR ADMINISTRATIVE REMEDIES BAR CONSIDERATION OF THIS CASE?
The Membership Act provides for an administrative appeal process. An ag *373 grieved applicant may “appeal any action of the Office to the Committee on Tribal Enrollment. Such appeal shall be filed within sixty (60) days after the date on which the Tribal Enrollment Office publishes and posts notice of its final determination.” See Membership Act, Sec. 12(a). The defendants argue that the plaintiffs’ failure to file an appeal with the Committee on Tribal Enrollment [hereinafter Committee]within sixty (60) days of their becoming a member of the Ho-Chunk Nation renders this Court without authority to decide the remaining issues presented by this case. See Defendant’s Brief at 3-4. The plaintiffs acknowledge that they did not file an appeal with the Committee. See Transcript of Oral Argument at 13.
The Court finds this argument to be unpersuasive. The Membership Act also specifically provides “that such approval shall not be retroactive.” See Membership Act, Sec. 6(e). The plaintiffs have requested a retroactive enrollment date, relief specifically forbidden by this section of the Membership Act. Had the plaintiffs filed an appeal with the Committee, they could not have been afforded the relief they sought. Moreover, the plaintiffs have requested that the Court declare a portion of the Membership Act unconstitutional. The Constitution specifically grants the authority to declare laws of the Ho-Chunk Nation void to the Judiciary, not the Committee. See Constitution, Art. VII, Sec. 6(b). See also Michele M. Ferguson v. Ho-Chunk Nation Insurance Review Commission/Division of Risk Management, CV 99-20 (HCN Tr. Ct., Aug. 12, 1999), aff'd SU 99-10 (HCN S.Ct., Nov. 15, 1999). In addition, the defendants would require the plaintiffs to do the absurd, i.e., appeal a decision favorable to them by reading between the lines that the effective date of admission to membership was unfavorable. With all due respect to learned counsel, this asks the near impossible of persons waiting for membership from as early as the 1960s, nearly twenty-five (25) years ago.
The defendants have argued that the Supreme Court’s decision in Sandra Sliwicki v. Rainbow Casino and Ho-Chunk Nation, Case No. SU 96-15, mandates a finding by this Court that the plaintiffs’ failure to timely exhaust their administrative remedies eliminates any need to discuss the remainder of this ease. See Transcript of Oral Argument at 33-34. In Sliwicki, the Trial Court had found a futility exception when an employee believed it to be futile to participate in the Administrative Review Process. See Sandra Sliwicki v. Rainbow Casino and Ho-Chunk Nation, SU 96-15 (HCN S.Ct., June 20, 1997) at 2. The Supreme Court determined that the Trial Court had erred in creating this futility exception. See id.
The Coui't is not persuaded by this argument. The futility exception disavowed by the Supreme Court was based in part on the employee’s perception that it would prove futile to exhaust the Administrative Grievance Process. The Administrative Grievance Process was not given the opportunity to work properly and the case was remanded to permit exhaustion. See id. at 3. In this case, it is not merely the plaintiffs’ perception that they would be unsuccessful in obtaining the relief sought through an appeal to the Committee. The Committee itself has an affirmative duty to follow the MEMBERSHIP ACT, and thus, in accordance with Section 6(e) of that ACT are absolutely forbidden from granting the plaintiffs a retroactive enrollment date. Additionally, it is not within the authority of the Committee to declare any portion of the Membership Act unconstitutional. That ability is found within the Court alone. See Ferguson (HCN Tr. Ct., Aug. .1.2, 1999). Moreover, the United States Supreme Court has stated: “Con *374 stitutional questions obviously are unsuited to resolution in administrative procedures and, therefore, access to the courts is essential to the decision of such questions.” See Califano v. Sanders, 430 U.S. 99, 109, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Court deems this to be persuasive authority in favor of court review of constitutional questions. It is simply impossible for the plaintiffs to receive any of the relief they seek through an appeal to the Committee. Unlike SUivicki, where the Administrative Review Process may have resolved the plaintiffs grievance, allowing judicial review in this case in no way infringes upon the ability of the Committee to provide a remedy prior to Court intervention.
The defendants also argue that the case has been filed in the Trial Court in an untimely manner as it should have been filed within 180 days of the Committee’s decision. See Defendant’s Brief at 3-4; See also Membership Act, Sec. 12(b). The Court is likewise not persuaded by this argument. In essence, the plaintiffs have alleged that a Constitutional violation occurred in their enrollment process. This Court knows of no applicable statute of limitations for a Constitutional violation. The Ho-Chunk Nation Statute op Limitations and Commencement of Claims, passed after the commencement of this case, is appropriately silent as to a statute of limitations for a Constitutional violation. A Constitutional violation is unconstitutional on the day it occurs, ie. void ab initio. It continues to be unconstitutional until such time as the violation is remedied. Therefore, the Court finds no bar to reaching the remaining issues raised by the plaintiffs.
II. 18 SECTION 6(f) OF THE MEMBERSHIP ACT UNCONSTITUTIONAL?
On March 1, 2000, the plaintiffs filed a Motion for Declaratory Judgment, requesting that the Court declare Section 6(f) of the Membeeship Act unconstitutional. Section 6(f) of the Membeeship Act required all persons with a pending enrollment application as of November 28, 1995 to re-submit their application. See Mem-bekship Act, Sec. 6(f). The plaintiffs argue that the re-submittal requirement: 1) unnecessarily and unreasonably forced the plaintiffs to begin their application process again; 2) acted as an artificial and arbitrary bar to the plaintiffs’ membership; 3) failed to promote the MEMBERSHIP ACT’s purpose; and 4) had the effect of delaying the plaintiffs’ enrollment applications which in turn delayed their enrollment. See Motion for Declaratory Judgment at 2.
The defendants mention this requirement within its brief, but fails to respond in a material fashion to the Motion for Declaratory Judgment, apparently presuming Section 6(f) of the Membership Act to be constitutional. See Defendant’s Brief at 6. At Oral Argument, the defendants were questioned as to this requirement, and given the lack of Legislative history surrounding the passage of the Membership Act, could only speculate that the Legislature wanted all members approved under the new Constitution to use the new enrollment application that contained the new membership criteria as stated within Article II, Section 1 of the Constitution. See Transcript of Oral Argument at 25-26.
After the new Constitution was passed, the plaintiffs submitted applications for membership on November 23, 1994. By virtue of the Ho-Chunk Nation Per Capita Distribution Ordinance, the plaintiffs first became eligible to receive the February 1, 1995 per capita distribution once they were approved as members as their applications had been pending more than sixty (60) days before that per capita distribution. See Ho-Chunk Nation Per Capita Distribu *375 tion Ordinance, Sec. 5.01(e). The plaintiffs were likewise eligible to receive the May 1, 1995 per capita distribution, the August 1, 1995 per capita distribution, and the November 1, 1995 per capita distribution after they were approved as members. See id.
Section 6(f) of the Membership Act divested the plaintiffs of their eligibility to receive these sums as it changed their application date. Moreover, given that the Membership Act was passed on November 28, 1995,[8] making it virtually impossible for the plaintiffs to submit new applications by January 3, 1996,[9] it likewise divested the plaintiffs of their eligibility to receive the February 1, 1996 per capita distribution.[10] The Constitution, Art. X, Sec. 1(a)(8) states: “The Ho-Chunk Nation, in exercising its powers of self-government, shall not ... deprive any person of liberty or property without due process of law.” On November 28, 1995, the plaintiffs were deprived of the above-enumerated per capita distributions by virtue of the passage of the Membership Act containing Section 6(f), requiring that they re-submit their applications. The defendant has brought forth no information concerning the due process received by the plaintiffs prior to this deprivation, as is required by the Constitution. The Constitution, by its very language (“deprive any person ”) does not limit this protection to members. It includes persons such as the plaintiffs, who have filed applications for enrollment. The Ho-Chunk Nation Legislature simply cannot deprive the plaintiffs of this property without affording them due process.
FOR THE FOREGOING REASONS, the Court declares Section 6(f) of the Tribal Membership and Enrollment Act of 1995 to be Unconstitutional. This portion can be severed in accordance with the Membership Act, Section 17, as Section 6(f) no longer effects applications for membership.[11]
III. THE PLAINTIFFS’ ENROLLMENT PROCESS
The plaintiffs have alleged that an equal protection violation occurred in their en *376 rollment process. They also allege that Enrollment failed to timely aet on their enrollment applications. The defendants counter that pursuant to the Constitution, the Legislature had to enact a membership code, and Enrollment was merely awaiting that membership code to proceed with the plaintiffs’ applications for enrollment. They also argue that Enrollment acted on the plaintiffs’ applications in a timely manner. The Court shall deal with the defendants’ arguments first.
A. Did the Legislature have to enact a membership code prior to Enrollment’s consideration of the plaintiffs’ applications for membership?
The Constitution states: “The Legislature shall have the power to enact laws not inconsistent with this Article to govern membership.” See Constitution, Art. II, Sec. 5. The defendants have argued that Enrollment was simply waiting for the Legislature to pass a law concerning membership. See Transcript of Oral Argument at 22. As the Court stated at the Oral Argument, the Court is unconvinced that Enrollment needed to wait for a new membership code to be able to address the pending applications for membership. See id. The plain language of the Constitution does not require a new code prior to consideration of pending applications. It merely requires that the Legislature pass a new code.
The Constitution, at Akticle II, Section 1, states the requirements for membership. With the passage of the Constitution in 1994, those possessing Nebraska Winnebago blood as well as Wisconsin Winnebago blood were eligible for membership within the Ho-Chunk Nation. The Constitution is the supreme law of the land, and ultimately, it is this article of the Constitution that determines whether or not an applicant is eligible for membership, not an enactment of the Legislature. Nothing within the Constitution prevented Enrollment from using the new enrollment qualifications as stated in the Constitution in conjunction with the WWBC Enrollment Ordinance until such time as the Legislature enacted a new code.
Moreover, the Constitution contains a Savings Clause. See Constitution, Art. XIV. This clause states: “All actions of the Nation, formerly known as the Wisconsin Winnebago Tribe, taken before the effective date of this Constitution, including elections and terms of office, shall remain in full force and effect to the extent that they are consistent with this Constitution.” See id. Upon the adoption of the Constitution, the WWBC Enrollment Ordinance, to the extent that it was consistent with the Constitution, remained effective. In essence, the Constitution acted to amend that ordinance, as it broadened the qualifications for membership. The Savings Clause required Enrollment to continue to process applications in accordance with that code, as amended by the qualifications for membership found within the Constitution.
B. Did Enrollment process the plaintiffs’ applications in a timely manner?
The defendants argue that Enrollment has always acted in a timely manner in processing the plaintiffs’ applications. See Defendants’ Brief at 7. The facts contradict that argument. On November 23, 1994, the plaintiffs submitted their applications for membership. On January 11, 1995, the plaintiffs were notified by George A. Greendeer, Enrollment Assistant, that their applications would be in a “pending” status until the Legislature enacted a new membership code. See Exhibit R-18. At that time, Mr. Greendeer believed that the new enrollment code would be passed *377 within two (2) to six (6) weeks. See id. Ultimately, the Membership Act was not passed until November 28, 1995. The plaintiffs’ applications had been in a “pending” status for over a year at that time. As discussed above, Enrollment was mistaken in its belief that this new membership code was required prior to consideration of the pending applications.[12]
At Oral Argument, the defendants were questioned as to what authority within the Constitution allowed Enrollment to place enrollment applications in a “pending” status. The defendants responded as follows: “Well, Your Honor, If ] guess [I’m] at a little bit of a loss due to legislative history, but I am aware of several times since I’ve been employed with the Ho-Chunk Nation that the Legislature has passed motions and — you know, to hold enrollment.” See Transcript of Oral Argument at 31. Upon further questioning, the defendants stated:
I guess not having been there it’s hard for me to say what the Enrollment Office was thinking or doing or if they were ordered to do it, I don’t know. It’s just my experience that the Legislature has acted, you know, to hold enrollment and whether you think that’s right or wrong, nevertheless they’ve done it and the Enrollment Office has acted.
See id. at 32.
The Court has carefully scrutinized the Constitution, and nowhere does it purport to allowr the Legislature, or Enrollment, to freeze enrollment within the Nation. The extensive list of powers reserved to the Legislature can be found at Article V, Section 2(a) — (x). This list certainly does not include the power to freeze enrollment.[13] In fact, the Legislature is charged with the power “ft]o protect and foster Ho-Chunk religious freedom, culture, language, and traditions”. See Constitution, Art. V, Sec. 2(r). It is counterproductive to freeze enrollment given this broad power, as freezing the enrollment of eligible members does absolutely nothing to protect or foster Ho-Chunk religious freedom, culture, language, and traditions.
The Court then turned to the Membership Act itself. The Membership Act contains no provision that would purport to allow Enrollment to freeze enrollment within the Nation, even if so directed by the Legislature. The Membership Act states: “All rights, benefits, privileges, and immunities of Membership shall take effect immediately upon timely approval of an application by the Office of Tribal Enrollment.” See Membership Act, Sec. 6(e) (emphasis added). The Membership Act requires that Enrollment process applications in a timely fashion. It is anything but timely if that application has been held for any reason other than the need for additional information, including the results of the required DNA testing.
FOR THE REASONS STATED ABOVE, Enrollment acted beyond the scope of its authority when it placed the plaintiffs’ applications in a “pending” sta *378 tus. Additionally, if Enrollment did so at the direction of the Legislature, the Legislature likewise acted beyond the scope of its authority.[14] Therefore, Enrollment, by virtue of its placing the plaintiffs’ applications in a “pending” status for reasons other than to obtain other necessary information, did not process the plaintiffs’ applications for enrollment in a timely fashion.
C. Do the plaintiffs meet the test enunciated in Sheila White Eagle v. Ho-Chunk Nation?
In Sheila, White Eagle v. Ho-Chunk Nation, CV 96-30, the Court adopted the following standard of review: the plaintiff carries the burden of proof, and must demonstrate that (1) a harm exists; (2) that the defendant caused the harm; and (3) that there is an available remedy for the harm that is within the power of the Court to grant. See Sheila White Eagle v. Ho-Chunk Nation (HCN Tr. Ct, Jan. 27, 1997) at 4-5. The Court shall address each of these elements in turn.
1. Have the plaintiffs proven that a harm exists?
The plaintiffs have alleged that the defendants failed to process their applications in a timely fashion, and that such untimely processing resulted in the loss of per capita distributions. Clearly, the plaintiffs have proven that Enrollment failed to timely process their application for enrollment. On January 11, 1995, Enrollment notified the plaintiffs that their applications had been placed in a “pending” status. See Exhibit R-18, The Court has found no authority within the Constitution to hold or freeze enrollment. Additionally, this untimely processing coupled with the unconstitutional requirement that the plaintiffs re-submit their applications [15] did in fact cause the plaintiffs to be divested of then* eligibility to receive the February 1, 1995 per capita distribution, the May 1, 1995 per capita distribution, the August 1, 1995 per capita distribution, the November 1, 1995 per capita distribution, and ultimately, the February 1, 1996 per capita distribution as well. The loss of such monies certainly constitutes a harm to the plaintiffs.
In addition, the plaintiffs allege that an equal protection violation occurred in their enrollment process. They base this allegation on the fact that although their applications were placed into a “pending” status until a new membership code was passed, Enrollment met and approved fifty-eight (58) persons for membership on March 31, 1995. The plaintiffs argue that if they had to wait for a new membership code, then these fifty-eight (58) people also should have been required to wait as well. The plaintiffs argue that they were treated unequally from these fifty-eight (58) people.[16]
The defendants counter this allegation by pointing out that these fifty-eight people had been approved by the Wisconsin Winnebago Business Committee in early 1994, and on March 31, 1995, Enrollment completed the process that had already been in the works prior to the adoption of the new Constitution. See Transcript of Oral Argument at 23. The Court is not *379 persuaded by this argument. If the plaintiffs had to wait until a new membership code and process could be enacted, so did any other person whose membership was not final. Equal protection of the laws, as is mandated by the Constitution, Article X, Section 1(a)(8), demands no less. Therefore, the Court finds that an equal protection violation also occurred in the enrollment process of the plaintiffs.
2. Have the plaintiffs proven that the defendants caused the harm?
It should be patently obvious that the defendants caused the harm to the plaintiffs. The plaintiffs submitted applications for enrollment on November 23, 1994. On January 11, 1995, Enrollment Assistant George A. Greendeer notified the plaintiffs that their applications were placed in a “pending” status, awaiting enactment of a membership code by the Legislature. See Exhibit R-18. Whether Enrollment did so at the instruction of the Legislature or on its own is of no consequence. Enrollment placed the applications in a “pending” status, without lawful authority to do so, resulting in harm to the plaintiffs. Moreover, Enrollment itself met on March 31, 1995, and issued final approval for membership for fifty-eight (58) people. In doing so, Enrollment violated the equal protection rights of the plaintiffs, again causing harm to the plaintiffs.
3. Remedy
The plaintiffs have requested that their enrollment date be made retroactive to March 31, 1995, the date that Enrollment met and approved the applications of fifty-eight (58) other people for enrollment. See Plaintiffs’ Brief at 17. In Sheila White Eagle, the Court hinted that this might be an appropriate remedy when a plaintiff could prove that Enrollment’s mishandling of the application caused harm to the plaintiff. See Sheila White Eagle at 5. The Court finds that the plaintiffs have presented credible evidence as to the mishandling of their applications by Enrollment. The Court finds that as of March 31, 1995, Enrollment required no additional proof that the plaintiffs were eligible for membership within the Ho-Chunk Nation, but impermissibly opted to wait for the enactment of a new membership code. Furthermore, it was on March 31, 1995, that Enrollment violated the equal protection rights of the plaintiffs by approving fifty-eight (58) persons for membership, while denying consideration to the equally qualified plaintiffs. Therefore, the Court ORDERS the Ho-Chunk Nation Office of Tribal Enrollment to list the plaintiffs’ enrollment date as March 31, 1995.[17] This is an equitable remedy, and certainly within the power of this Court as it has found that Enrollment acted beyond the scope of their authority.
The plaintiffs have also requested monetaiy damages in terms of the per capita distributions from March 31,1995 to February 1, 1996.[18] The defendants have argued that the Nation has not waived its sovereign immunity as to enrollment disputes, and absent such a waiver, the Court may not award monetary damages. The defendants also point to the Court’s decision in Sheila White Eagle as an additional proof of the Court’s inability to award *380 monetary damages. See id.; see also Defendants’ Brief at 4-5.
The Court has determined that the defendants acted unconstitutionally in the enrollment process of the plaintiffs. The Court finds that the Nation cannot act unconstitutionally and then assert its sovereign immunity to avoid paying monetary damages. The Supreme Court of the United States has also determined that the United States may not act unconstitutionally and then assert its sovereign immunity to avoid the payment of monetary damages. See Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The plaintiffs were clearly deprived of per capita distributions due to the unconstitutional actions of the defendants. Therefore, the Court ORDERS the defendants [19] to pay to the plaintiffs the following per capita distributions as damages stemming from the unconstitutional conduct of the Nation: the February 1, 1995 per capita distribution, the May 1, 1995 per capita distribution, the August 1, 1995 per capita distribution, the November 1, 1995 per capita distribution, and the February 1, 1996 per capita distribution.[20]
Essentially, a per capita distribution is the equal division of the declared total among all eligible persons. For the per capita distributions listed above, each member received too much money as there should have been funds set aside for each of the plaintiffs in recognition that their applications had been pending for more than sixty (60) days prior to each of the distributions listed above in accordance with the Per Capita Distribution Ordinance.[21] Instead of asking each enrolled member at that time to refund the overpayment to the Nation, the Court has deemed it just to require the Nation to pay the plaintiffs the full amount of each of the above distributions, minus applicable taxes.
Additionally, the plaintiff has requested attorney’s fees and costs. The Court is able to award costs to the prevailing party but has no statutory or other authority to grant attorney’s fees. Upon the proper presentation of a cost bill the Court shall consider awarding the costs. See HCN R. Civ. P. 53.
CONCLUSION
The basis for this case is a long-standing enrollment dispute. The plaintiffs had been trying for twenty-two (22) years to become enrolled members of the Wisconsin Winnebago Tiibe of Wisconsin prior to the adoption of the new Constitution in 1994. With the adoption of the new Constitution, the plaintiffs became eligible for enrollment and submitted applications for enrollment. The enrollment process endured by the plaintiffs was improperly de *381 layed by Enrollment placing their applications in a “pending” status without any authority to do so. The plaintiffs were also treated unequally compared to the fifty-eight (58) other applicants who did not depend on Nebraska Winnebago blood quantum to qualify for membership. The plaintiffs were also unconstitutionally required to re-submit their applications after the enactment of the Membership Act. The Court orders that Enrollment remedy the plaintiffs by awarding a retroactive enrollment date of March 31, 1995. The plaintiffs have been awarded the per capita distributions that they were deprived of by the improper and unlawful actions of Enrollment and the Legislature. Lastly, the Court has declared Section 6(f) of the Ho-Chunk Nation Tribal Enrollment and Membership Act of 1995 unconstitutional.
The parties retain the right to file a timely post judgment motion with this Court in accordance with HCN R. Civ. P. 58, Amendment to or Relief from Judgment or Order. Otherwise, “[a]ny final Judgement or Order of the Trial Court may be appealed to the Ho-Chunk Nation Supreme Court. The Appeal must comply with the Ho-Chunk Nation Rules of Appellate Procedure [hereinafter HCN R.App. P.l, specifically [HCN R.App. R], Rule 7, Right of Appeal.” HCN R. Civ. P. 61. The appellant “shall within thirty (30) calendar days after the day such judgment or order was rendered, file with the [Supreme Court] Clerk of Court, a Notice of Appeal from such judgment or order, together with a filing fee of thirty-five dollars ($35 U.S.).” HCN R.App. P. 7(b)(1). “All subsequent actions of a final Judgement or Trial Court Order must follow the [HCN R.App. P.].” HCN R. Cm P. 61.
IT IS SO ORDERED.

The Court would like to extend its appreciation to Staff Attorney Katherine Kruger for her assistance in the preparation of this Judgment.

. According to the documentation provided by the defendants, this version was still in effect as of May 31, 1996. See Memorandum dated May 31, 1996 to Gary Brownell, Assistant to the Attorney General, from John Espi-nosa, Legislative Counsel.

. According to the documentation provided by the defendants, this version had not been approved by the Secretary of the Interior as of May 31, 1996. See Memorandum dated May 31, 1996 to Gary Brownell, Assistant to the Attorney General, from John Espinosa, Legislative Counsel. No indication is made as to when or if the Secretary of the Interior approved these amendments.

. The Court has opted to deviate from the parties' Stipulated Fact Number 5, as it is not factually correct. James Whitewater is not the father of all of the plaintiffs.

. The Court uses Wisconsin Winnebago for all dates prior to 1994. With the adoption of the new Constitution, the Wisconsin Winnebago became the Ho-Chunk Nation.

. The Court notes that based upon the family trees presented as evidence, the BIA determination of blood quantum appears to be in error. If James and Raymond Whitewater possessed 3/8 degree of Wisconsin Winnebago blood, their children then possessed 3/16 (slightly more than 1/8) degree of Wisconsin Winnebago blood.

. The Court notes that it has stricken the original Finding of Fact number 46 as stipulated by the parties. Stipulated Finding of Fact number 46 was to read: "As the plaintiffs were not members until June, 1996 they were not entitled to receive any per capita payments between time of application and membership approval.” The Court finds this to be inconsistent with Finding of Fact number 44 which specifically states that the plaintiffs received the May 1996 per capita distribution after they were approved as members.

. The Court is unaware of when the Secretary of the Interior approved this amendment, and consequently does not know the effective date of the amendment. There may be an issue of its retroactive application to persons whose applications were already pending, but that case is not before the Court.

. Section 6(f) of the Membership Act also required that Enrollment provide those persons with pending applications with notice of the requirement to re-submit their applications within fourteen (14) days of the passage of the Membership Act. The parties agree that the plaintiffs did not receive their notice as mandated by this section within fourteen (14) days. See Defendants’ Brief at 6. What puzzles the Court is why the new application did not accompany this notice. Each person had to request a new application from Enrollment, delaying the submission of new applications even more. Moreover, it would have been more cost-effective had Enrollment mailed each applicant both the notice of the requirement to re-submit an application and the new application at the same time. By the original submission of an application, each person had manifested an intent to become a member of the Nation, and it is unlikely that any of these persons had changed their mind while the Legislature worked on the Membership Act.

. In fact, after requesting new applications, the plaintiffs did not receive their applications until around January 24, 1996, well beyond the deadline for their submitted applications to make them eligible to receive the February 1, 1996 per capita distribution.

. The Legislature demonstrated that it understood the costs associated with using the word "submitted” for eligibility purposes as it amended this section to say “approved” on January 26, 1996. See Ho-Chunk Nation Resolution No. 01/30/96B; see also Ho-Chunk Nation Amhndud Per Capita Distribution Ordinance.

. The effect of Section 6(f) was limited to the 455 persons with pending applications for enrollment as of November 28, 1995. Presumably, each of these persons re-submitted their application upon being informed of this requirement by the Ho-Chunk Nation Office of Tribal Enrollment.

. Apparently, Enrollment did not require the new membership code to be passed prior to approving new membership applications, as they approved new membership applications when they met on March 31, 1995. See Defendants’ Brief at 5. If one of the goals was to have all new members approved under the new Constitution have identical application forms, the new form could have been provided to the plaintiffs any time after March 31, 1995.

. The Legislature possesses only those powers specifically granted to it by the General Council, See Constitution, Art, IV, Secs. 1, 2. The General Council has the power to freeze enrollment if a quorum votes in favor of it, but the Court is unaware of any official actions taken by the General Council to do so.

. The parties are unclear as to whether this hold or freeze occurred at the direction of the Legislature. See Transcript of Oral Argument at 32,

. This factor was further compounded by the untimely notification of the requirement to resubmit their applications.

.Specifically, the plaintiffs have argued that they, persons with some Nebraska Winnebago blood were treated differently than these fifty-eight (58) people, none of whom possessed any Nebraska Winnebago blood. See Transcript of Oral Argument at 6-7.

. The Court notes that the requirement that a person be enrolled five (5) years prior to receiving housing benefits from the Nation was a tangential issue raised by the plaintiffs. As the plaintiffs did not request anything with regard to this issue, and this retroactive enrollment date adequately addresses the issue as raised by the plaintiffs, the Court declines to comment further on this issue.

. The plaintiffs have already received the May 1, 1996 per capita distribution.

. In ordering the Legislature to pay these sums of money to the plaintiffs, the Court has not impermissibly ventured into the sphere of the appropriation power held by the Legislature. The Court has not mandated how the Legislature pays this from the current budget, and nothing within this opinion or the Constitution prevents the Legislature from creating a judgment fund.

, The Court notes that the plaintiffs did not request the February 1, 1995 per capita distribution. As- this is not a default judgment, the Court may award any relief that the evidence makes appropriate. See Ho-Chunk Nation Rules of Civil Procedure, Rule 53. In this case, but for the unconstitutional actions of the defendants, the plaintiffs also would have been entitled to receive the February 1, 1995 per capita distribution, making such relief appropriate.

.In other words, for each of these distributions, the actual per capita distribution amount should have been: declared total/inumber of enrolled members + 9).